# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. STUART RONALD CLARKE, Defendant. | MEMORANDUM DECISION<br><br>Case No. 2:13-cr-282-PMW<br><br>Magistrate Judge Paul M. Warner |

On April 23, 2013, the United States of America ("Government") filed a misdemeanor information against Stuart Ronald Clarke ("Defendant").[1] On September 19, 2013, the parties appeared before Magistrate Judge Paul M. Warner for a bench trial.[2] Alicia H. Cook and Michael P. Kennedy appeared on behalf of the Government. Matthew P. Jube appeared on behalf of Defendant. After completion of the trial, the court took the case, as well as a motion to dismiss made by Defendant at the close of the Government's case, under advisement. Now being prepared to rule, the court issues the instant memorandum decision.

## FACTUAL BACKGROUND

Based on the testimony and exhibits received during the above-referenced bench trial, the court makes the following factual determinations.

---

[1] *See* docket no. 1.

[2] *See* docket no. 30.

On November 17, 2012, Angelica Aguilar ("Ms. Aguilar") was a passenger on Delta flight number 2333, originating from Washington, D.C., and stopping in Minneapolis, Minnesota, before proceeding on to Salt Lake City, Utah. Ms. Aguilar was in seat 25F, a window seat. Defendant boarded the plane in Minneapolis, as he was connecting from an overseas flight from Amsterdam. He was in seat 25E, the middle seat to Ms. Aguilar's left.

At the beginning of the flight, Ms. Aguilar noticed that Defendant was scratching his upper thigh. Defendant had a coat covering his lap and his right arm during the flight and he was continually moving his arm under the coat. Ms. Aguilar further testified that Defendant did not have any conversation with her throughout the flight. As the flight approached Salt Lake City, it was dark outside the plane. Inside the plane, it was not well lit because the lights were dimmed. During the plane's descent, Ms. Aguilar bent over to put her eyeglasses in a bag at her feet. While she was bent over, Ms. Aguilar was first able to see that Defendant was holding his exposed penis in his right hand. Ms. Aguilar confronted Defendant, who responded by apologizing and adjusting his coat to more fully cover his lap. When the plane landed shortly thereafter in Salt Lake City, Ms. Aguilar notified a flight attendant on the plane about the incident and later reported the incident to Salt Lake Airport Police Department ("SLAPD").

Jacob Haggerty, a police officer with the SLAPD ("Officer Haggerty"), took the report from Ms. Aguilar. Officer Haggerty discovered Defendant's identity from the Delta flight records, and he obtained a description of Defendant from Ms. Aguilar. Officer Haggerty and other officers searched for Defendant, but were unsuccessful in locating him at the airport. Officer Haggerty then showed Ms. Aguilar surveillance footage of the airport, and Ms. Aguilar

was able to identify Defendant from that footage. The surveillance video showed Defendant exiting the aircraft and waiting for his luggage at a baggage carousel for approximately 12 minutes. Officer Haggerty was later notified that Delta had a bag belonging to Defendant in its baggage office. Officer Haggerty placed the bag, along with other items, in the evidence room for safekeeping.

Allen Christensen, another officer with the SLAPD ("Officer Christensen"), was later contacted by Officer Haggerty concerning the incident on the airplane and the bag belonging to Defendant. At trial, Officer Christensen testified that he investigated Defendant's criminal history and found that Defendant had no criminal record of any kind.

Officer Christensen and a FBI agent interviewed Defendant on the day following the incident. Defendant was not given prior notice that the interview was going to take place. Instead, he was told that the purpose of the officers' visit was to deliver his bag that was left at the airport (in fact, this was a ruse, as they did not intend to, nor did they, deliver the bag). The interview took place at Defendant's residence, and Defendant's wife was present during the interview. Defendant was cooperative throughout the interview. During the interview, Defendant indicated that he had a headache prior to his flights. Defendant stated that he did not believe in using medications, so he applied some peppermint oil on his forehead in Amsterdam, where Defendant's trip originated. Defendant later testified at trial that he again applied the peppermint oil in Minneapolis before boarding the plane for Salt Lake City. Defendant also indicated that he used the restroom after applying the peppermint oil and inadvertently transferred some of the peppermint oil to his genitals. During the interview, Defendant's wife,

Carlin Clarke stated that she, Defendant, and their family regularly used the peppermint oil and other essential oils on a consistent basis, and she provided the officers with a bottle of peppermint oil that she happened to have nearby. Defendant stated that the peppermint oil on his genitals caused burning and irritation, so he was scratching the area and, eventually, unbuttoned several buttons on his pants. Defendant indicated that he removed his penis from his undergarments to obtain some relief, but did not remove it from his pants. During his testimony at trial, Defendant stated that his coat was covering his lap during the entire flight and that he did not believe he had exposed himself to anyone. The other passenger seated next to Defendant on the aisle testified that she did not see Defendant expose his penis.

## **ANALYSIS**

The single count of the information in this case charges Defendant with violating 49 U.S.C. § 46506(2). Pursuant to that statute, it is unlawful for any individual on an aircraft in the special aircraft jurisdiction of the United States to commit an act that would violate D.C. Code § 22-1312.[3] At trial, Defendant stipulated to the fact that the alleged offense occurred within the special aircraft jurisdiction of the United States.

In relevant part, D.C. Code § 22-1312 provides that "[i]t is unlawful for a person, in public, to make an obscene or indecent exposure of his or her genitalia or anus, to engage in

---

[3] The federal statute in question, 49 U.S.C. § 46506(2), provides that it is unlawful for any individual on an aircraft in the special aircraft jurisdiction of the United States to commit an act that would violate D.C. Code § 22-1112. However, D.C. Code § 22-1112 has been replaced by D.C. Code § 22-1312. *See* D.C. Code § 22-1312, Prior Codifications. Accordingly, the court will refer to the updated statute, D.C. Code § 22-1312, in this memorandum decision. In addition, the court will refer to and rely upon cases interpreting the former version of the statute, D.C. Code § 22-1112.

4

masturbation, or to engage in a sexual act as defined" by the D.C. Code. D.C. Code § 22-1312. As presented at trial, the Government sought to prove only the prong of the statute concerning an obscene or indecent exposure of Defendant's genitalia.

In addition to proving the other elements of the offense under D.C. Code § 22-1312 beyond a reasonable doubt, the Government must also prove the element of criminal intent beyond a reasonable doubt to support a conviction. *See Peyton v. D.C.*, 100 A.2d 36, 37 (D.C. 1953) ("We agree that a criminal intent must be shown in a prosecution under this statute before a conviction can be upheld."). Under D.C. Code § 22-1312, "[a]n exposure becomes indecent when the defendant exposes himself at such a time and place, where as a reasonable man . . . knows or should know his act *will be open to the observation of others*." *Id*. (emphasis added). "[I]n order to be convicted of this offense, a defendant must have intended to do the prohibited act, though 'the intent required is only a general one, and need not be directed toward any specific person or persons.'" *Parnigoni v. D.C.*, 933 A.2d 823, 826 (D.C. 2007) (quoting *Peyton*, 100 A.2d at 37). "On the other hand, . . . [o]rdinary acts involving exposure as a result of *carelessness* or *thoughtlessness*, particularly when such acts take place within the privacy of one's home, do not in themselves establish the offense of indecent exposure." *Id*. at 826-27 (second alteration in original) (quotations and citation omitted) (emphasis added).

In this case, the court concludes that the Government has failed to prove Defendant committed a violation of D.C. Code § 22-1312 beyond a reasonable doubt, based on the intent element of the offense. The following facts support that conclusion.

First, it is undisputed that Defendant was covering his lap with a coat or a jacket during the entirety of the flight, including during the incident. Second, according to Ms. Aguilar's testimony, which the court finds credible, Defendant continued to keep the coat or jacket over his lap for the entire duration of the flight, and she did not first see the exposure until she bent over to put her eyeglasses in a bag at her feet near the end of the flight. Third, she further testified that Defendant did not have an erection. Fourth, the plane was not well lit (a night flight with a movie). Fifth, Defendant demonstrated no consciousness of guilt following the incident. To the contrary, video evidence reveals Defendant casually exiting the plane, and the airport surveillance footage further shows Defendant waiting at the baggage carousel for his luggage for approximately 12 minutes. This occurred even as law enforcement officers were in the same area searching for him, but failing to recognize him. Sixth, Defendant testified that he did not believe he had exposed himself to anyone during the flight. Just as in the case of Ms. Aguilar, the court finds his testimony to be credible, as well. Finally, Defendant is a 49-year-old man with no criminal history at all; and in particular, no history of lewd conduct. It is a reasonable inference from the facts in this case that it would be unusual for such a man to begin this type of obscene behavior at this stage in his life, and in particular, on an airplane. In other words, past behavior is often a good indicator of either present or future conduct. More importantly, intent is proven by the totality of the circumstances, and Defendant's lack of any similar history or conduct is a significant factor in determining his intent, along with all the other facts previously enumerated.

Accordingly, when all the evidence in this case is taken as a whole, the court concludes that reasonable doubt exists as to Defendant's intent to expose himself. Certainly, his behavior

constituted incredibly poor judgment; however, the above-referenced facts create sufficient doubt as to his general intent for others to see the exposure. Rather, it is entirely possible that Ms. Aguilar unfortunately saw what she did due to the fact that in the process of putting her eyeglasses away, it provided a line of sight for the exposure to occur, in combination with Defendant inadvertently shifting his coat enough for her to see his penis. It is also possible, within the standard of reasonable doubt, that Defendant did not reasonably anticipate or even realize it had happened until she called it to his attention. In sum, the court has determined that reasonable doubt exists as to the intent element of the offense and that Defendant's exposure of his penis could have been an act of carelessness or thoughtlessness, which does not establish a violation of the statute. *See id.*

## CONCLUSION AND VERDICT

Based on the court's conclusion that the Government has failed to prove Defendant's intent to commit a violation of D.C. Code § 22-1312 beyond a reasonable doubt, Defendant's motion to dismiss is **MOOT** and Defendant is adjudged **NOT GUILTY**.

DATED this 21st day of November, 2013.

BY THE COURT:

PAUL M. WARNER
United States Magistrate Judge